**Reginald Antoine MABRY, Plaintiff,**

v.

**NEIGHBORHOOD DEFENDER SERVICE and Walter Patrick Jones, Defendants.**

No. 10 Civ. 4016 (PKC).

United States District Court, S.D. New York.

Jan. 31, 2011.

Reginald Antoine Mabry, Bronx, NY, pro se.

Jacqueline Carmen Gerrald, Janet Cohn Neschis, Steven J. Hyman, McLaughlin

and Stern, LLP, New York, NY, for Defendants.

### MEMORANDUM AND ORDER

P. KEVIN CASTEL, District Judge:

Plaintiff Reginald Antoine Mabry brings this action *pro se* against the Neighborhood Defender Service ("NDS") and Walter Patrick Jones, Executive Director of NDS, in his individual capacity, pursuant to the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.,* Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e, *et seq.,* as amended by the Civil Rights Act of 1991, Title I of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12203 *et seq.,* the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. L. § 290, *et seq.,* and the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8–101, *et seq.* Plaintiff who continues to be employed by NDS, contends that he was subjected to unlawful discrimination, hostile work environment and retaliation on the basis of age and discriminated against on the basis of disability. Defendants now move to dismiss the Complaint pursuant to Rule 12(b)(6), Fed.R.Civ.P., for failure to state a claim upon which relief can be granted. For the reasons stated below, defendants' motion to dismiss is granted.

BACKGROUND

Plaintiff, Reginald Antoine Mabry, age 45, is currently employed as the Computer Services Director for defendant, Neighborhood Defender Services ("NDS"). (Compl. ¶¶ 2–3.) NDS, founded in 1991 as a project of the Vera Institute of Justice, is a public interest law firm that provides legal representation regarding criminal matters to indigent residents of Upper Manhattan. (*Id.* ¶ 4.) Plaintiff was hired by NDS in 1994 as a Network Technician. (*Id.* ¶ 3.) In plaintiff's 17 years with NDS, he has been promoted twice, from Network Technician to Computer Services Manager and subsequently from Computer Services Manager to Computer Services Director—the position he currently holds. (*Id.* ¶¶ 2–3.) As Computer Services Director, plaintiff maintains NDS's computer equipment and manages technology improvement, implementations and migrations. (*Id.* ¶ 63.)

NDS is funded predominantly by New York City agencies, and also receives some funding from New York State. (*Id.* ¶ 4.) NDS's yearly budget is not fixed and is decided by vote of the New York City Council. (*Id.* ¶¶ 4, 62.) In 2008, the New York City and New York State agencies that fund NDS instituted significant budget cuts. (*Id.* ¶ 111.) "As a result of the budget cuts, NDS instituted an across the board 3% cap on raises for administrative staff." (*Id.*) Prior to these budget cuts, administrators had received 5% raises each year. (*Id.* ¶ 88.) As Computer Services Director, plaintiff is a member of NDS's administrative staff. In addition to administrators, NDS also employs attorneys. According to plaintiff's Complaint, NDS hires and promotes attorneys from within its ranks rather than making lateral hires and pays its attorneys based on the number of years out of law school. (*Id.* ¶¶ 27–28.) Attorneys' salaries were not affected by the budget cuts. (*Id.* ¶¶ 27, 111.)

Prior to June 5, 2008, plaintiff alleges that he was supervised exclusively by Leonard Noisette, then Executive Director of NDS. (*Id.* ¶ 3(a).) In early 2008, Noisette gave notice that he was resigning from his position as Executive Director. (*Id.* ¶ 11.) Noisette was succeeded as Executive Director by defendant Walter Patrick Jones, age 47, beginning in approximately July 2008. (*Id.* ¶¶ 12, 110.) In May 2008, Jones notified all staff members that he would like to meet with each of them individually. (*Id.* ¶ 13.) On June 2,

2008, plaintiff met with Jones and Jones' secretary at a "very informal" meeting at which Jones elicited answers from plaintiff to three questions: (1) "What is good about the Neighborhood Defender Service?" (2) "What is not?" and (3) "What can you do to make NDS better?" (*Id.* ¶ 15.)

Also at the June 2, 2008 meeting, plaintiff alleges that he informed Jones of his "issues with Thomas Giovanni." (*Id.*) Thomas Giovanni, under the age of 40, is an attorney and criminal team supervisor at NDS. (*Id.* ¶¶ 3(a)-(b).) According to plaintiff's Complaint and documents relied on by plaintiff in drafting his Complaint, plaintiff's "issues" with Giovanni stem from Giovanni's behavior towards him when the two worked together:

> I have a serious [sic] of complaints that I have spoken to all of you about a pattern of behavior that Thomas Giovanni has followed when we have worked together. The pattern begins with him making complaints or pointing out issues, then I respond and if he doesn't like my response he counters in a condescending unproductive matter [sic] and this even involved him using an [sic] totally workplace inappropriate comments such as 'When I press Print, I want the Fucking thing to Print—why can't that happen?' All the while, this is happening, I am working on fixing the core of his complaints. All the while, it seems that he is making me feel that I am acting insubordinate. When at the end of the day 99% if [sic] the problems get solved. At the end of day [sic], I find his conduct unprofessional, and I expected that the organization would have fixed that.

(June 6, 2008 Email, attached at Gerrald Decl. Ex. C.) Plaintiff alleges that he has made several complaints about Giovanni's management style. (Compl. ¶ 19.)

Shortly after the June 2, 2008 meeting with Jones, Giovanni sent plaintiff a letter explaining that Jones asked him to follow-up with plaintiff regarding the resolution of computer problems experienced by Gakia, Jones' secretary. (*Id.* ¶ 16.) On June 5, 2008, plaintiff responded back to Giovanni with potential solutions. (*Id.* ¶ 17.) That same day, Giovanni responded to plaintiff with additional issues, without relaying the messages to Jones. (*Id.* ¶ 18.) Plaintiff alleges that based on this interaction with Giovanni he believed that Giovanni was now directly supervising him. (*Id.*) According to the Complaint, plaintiff found it unusual that Giovanni, an attorney, under the age of 40 and a criminal team supervisor, would supervise plaintiff, who is 45 and Computer Services Director. (*Id.* ¶ 21.) Plaintiff also found the supervision troubling given the problematic history between himself and Giovanni. (*Id.* ¶¶ 19-22.) Plaintiff communicated his concerns regarding Giovanni to NDS's Human Resources Director on June 5, 2008 (*Id.* ¶¶ 25, 31; June 5, 2008 Email, attached at Gerrald Decl. Ex. B.) and to Noisette, Jones and the Human Resources Director on June 6.2008. (Compl. ¶ 32; June 6, 2008 Email, attached at Gerrald Decl. Ex. C.)

On June 13, 2008, Jones responded to plaintiff addressing his concerns. (Compl. ¶ 33.) Jones informed plaintiff that he had looked into his allegations concerning Giovanni, by, among other things, reading the last month of email exchange between plaintiff and Giovanni, and "found the emails to be appropriate in all respects." (June 13, 2008 Email, attached at Gerrald Decl. Ex. D.) Moreover, Jones found the recent interactions between the two with regards to Gakia's computer problems to be not "even remotely hostile, inappropriate or out of line." (*Id.*) Jones also informed plaintiff that Giovanni was a "Team Leader and senior manager" and that Giovanni's "relevant and appropriate requests" should be addressed in a timely

manner and without complaint. (*Id.*) Jones' concluded: "I trust this will end the matter." (*Id.*)

Plaintiff alleges that prior to this email he had no knowledge that Giovanni was a senior manager. (Compl. ¶¶ 36–39.) Moreover, plaintiff alleges that his complaints were not handled appropriately by NDS. (*Id.* ¶¶ 40–44.) Specifically, the Complaint alleges that NDS did not follow the procedure for such claims set forth in its personnel manual, that Jones was not authorized to intervene because he was not impartial, that the Human Resources Director and Executive Director did not investigate before Jones responded and NDS did not make a final finding regarding plaintiff's claims. (*Id.*)

During the week of June 23, 2008, Jones requested that plaintiff schedule a "second interview" with him for the coming weeks. (*Id.* ¶ 49.) On July 7, 2008, plaintiff requested an agenda for the meeting, but did not receive one. (*Id.* ¶ 50.) Additionally, on July 7, 2008 plaintiff submitted to Jones' secretary a Family Medical Leave Act ("FMLA") form that had been completed by plaintiffs psychologist. (*Id.* ¶ 51.) The FMLA form states that. beginning in approximately March 2008, plaintiff began to complain of "anxiety, depressed mood, stress, chronic tension headaches, [and] insomnia." (FMLA Form at ¶ 4, attached at Gerrald Decl. Ex. F.) The form further states that the duration of plaintiff's conditions is unknown and is "dependant on work situation and stressors." (*Id.* ¶ 5(a).) Finally, the form states that (1) plaintiff is not incapacitated, (2) plaintiff's condition does not require him to take medical leave, (3) plaintiff's condition does not prevent him from performing one or more essential functions of his job, and (4) plaintiff does not need to work intermittently or to work on a less than full schedule as a result of his condition. (*Id.* ¶¶ 5(b), 5(c), 7(a), 7(c).) The form does state that plaintiff may need to use his sick days to attend weekly psychotherapy sessions. (*Id.* ¶¶ 6(a), 6(c), 7(c).)

Plaintiff and Jones, along with Jones' secretary and Roxanna Gutierrez, an attorney, age 46, met for plaintiff's "second interview" on July 17, 2008. Plaintiff alleges that he requested that the Human Resources Director attend the meeting but that his request was denied. (Compl. ¶¶ 53–54.) At the beginning of the meeting, plaintiff alleges that Jones told him to "relax, don't have any anxiety and don't be stressed." (*Id.* ¶ 56.) According to the Complaint, plaintiff immediately told Jones that his condition is medical and personal. (*Id.*) No further discussion of plaintiff's medical conditions took place at the meeting. Plaintiff alleges that he was never afforded "interactive sessions" to determine if NDS could find reasonable accommodations for his condition. (*Id.* ¶ 157.)

During the meeting, Jones informed plaintiff that Gutierrez had been named Chief Operating Officer of NDS and henceforth would be plaintiff's direct supervisor. (*Id.* ¶ 59.) As COO, Gutierrez was also to be the supervisor of the Director of Human Resources and Facilities. (*Id.* ¶ 60.) According to the Complaint, Jones informed plaintiff that "the COO position will help deal with complaints that [Jones] has been getting [about plaintiff]" including that he is "rude, inconsiderate and shows favoritism," "is also slow to upgrade the companies [sic] computers and that is conservative," "does not 'think out of the box,'" and "is too conservative." (*Id.* ¶ 61.) Plaintiff alleges that he was unaware of any performance issues, works with his limited technology budget to the best of his ability and has an excellent record. (*Id.* ¶¶ 62–64, 68.) Plaintiff requested that an investigation into the performance issues take place and Jones responded that going forward Gutierrez

would investigate any issues. (*Id.* ¶ 71.) Plaintiff alleges that he believes he was "singled out for evaluation to find negative performance issues." (*Id.* ¶ 82.) Plaintiff further alleges that NDS only evaluates employees as a step to discipline, but that he was not put on a performance improvement plan at the conclusion of the meeting. (*Id.* ¶¶ 77, 86.) Finally, at the meeting, Jones informed plaintiff that he had an acquaintance at the consultant firm of Kraft Kennedy and that the firm would be willing to lend their "young associates" to NDS to evaluate its technology. (*Id.* ¶¶ 80–81.)

The Complaint alleges that Jones had similar "second interview" meetings with the Human Resources Director, Annoguie Viruet, over the age of 40, and one of NDS's supervising attorney, Kenn Gilbert, also over the age of 40. (*Id.* ¶¶ 83–84.) Plaintiff alleges that at these meetings Viruet was told that the COO would supervise her and that some of her duties would be changed and Gilbert, a supervising attorney for over 10 years, was relieved of his supervisory title and that he, Gilbert, would be supervised by another attorney, Matthew Knecht, under the age of 40. (*Id.*)

In August 2008, NDS held a staff meeting to describe the changes to its organizational structure. (*Id.* ¶ 96.) At the meeting, the new roles of Giovanni and Knecht, as senior managers, and Gutierrez, as COO, were described, along with the change in the supervisory reporting structure for plaintiff, Viruet and Gilbert. (*Id.* ¶¶ 99–101.) Apart from this change in supervision, plaintiffs role was not described differently from what it had previously been. (*Id.* ¶ 107.) However, plaintiff alleges that Gutierrez, his supervisor, began delivering the IT department reports at staff meetings, rather than plaintiff. (*Id.* ¶¶ 133.) The Complaint does not allege

when this change occurred. Plaintiff alleges that the above changes were described in a Power Point presentation and that no new personnel manuals or written descriptions of positions were distributed. (*Id.* ¶¶ 97–98, 103–104.) Moreover, plaintiff alleges that the staff was not given explicit notice of any bona fide reorganization. (*Id.* ¶¶ 136–138.)

In December 2008, plaintiff filed a complaint with the Equal Employment Opportunity Commission ("EEOC") relaying the facts set forth above and alleging that they amounted to discrimination on the basis of age and disability. (*Id.* ¶ 108, EEOC Complaint, attached to Compl.) In April 2009, plaintiff received NDS's Position Statement to the EEOC complaint denying that any such discrimination occurred. (Compl. ¶ 109.) Plaintiff alleges that NDS's response was pretextual and contained factual inaccuracies. (*Id.* ¶¶ 122–130.) The Complaint further alleges that as a reaction to the filing of the EEOC complaint by plaintiff, (1) Jones has not verbally spoken to plaintiff; and (2) Jones has not invited plaintiff to any management meetings. (*Id.* ¶¶ 131–132.)

In April 2010,[1] one year and three months after plaintiff filed his EEOC complaint, plaintiff requested a "right to sue" letter from the EEOC. (*Id.* ¶ 8.) The EEOC duly issued the letter to plaintiff on May 10, 2010 and plaintiff timely filed this Complaint on May 14, 2010, within 90 days. (*Id.* ¶ 9, EEOC Right to Sue Letter, attached to Compl., Docket # 1.)

DISCUSSION

I. *Motion to Dismiss Standard*

To survive a motion to dismiss under Rule 12(b)(6), Fed.R.Civ.P., "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ash-*

---

**1.** In the Complaint, the date is mistakenly stated as April 2009.

croft v. Iqbal, —— U.S. ——, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). " 'Labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do,' " rather, a plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955). In considering a Rule 12(b)(6) motion to dismiss, all non-conclusory factual allegations are accepted as true, *see id.* at 1949–50, and all reasonable inferences are drawn in favor of the plaintiffs. *See in re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir.2007) (per curiam). Moreover, *pro se* pleadings are construed generously and interpreted to raise the strongest arguments that they suggest. *See Weixel v. Bd. of Educ. of the City of New York*, 287 F.3d 138, 145–46 (2d Cir.2002).

In employment discrimination cases, the *Iqbal* plausibility standard applies in conjunction with the pleading standards set forth in *Swierkiewicz v. Sorema, N.A.*, 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002). *See Gillman v. Inner City Broad., Corp.*, 08 Civ. 8909(LAP), 2009 WL 3003244, *3 (S.D.N.Y. Sept. 18, 2009) ("The *Iqbal* plausibility standard applies in conjunction with employment discrimination pleading standards .... *Iqbal* was not meant to displace *Swierkiewicz*'s teachings about pleading standards for employment discrimination claims because in *Twombly*, which heavily informed *Iqbal*, the Supreme Court explicitly affirmed the vitality of *Swierkiewicz*."); *see Twombly*, 550 U.S. at 547, 127 S.Ct. 1955 ("This analysis does not run counter to *Swierkiewicz* .... Here, the Court is not requiring heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face."); *Iqbal*, 129 S.Ct. at 1953 ("Our decision in *Twom-*

*bly* expounded the pleading standard for all civil actions, and it applies to antitrust and discrimination suits alike." (internal quotation marks and citations omitted)).

■■■ At the pleading stage, *Swierkiewicz* teaches that a plaintiff is not required to come forth with allegations sufficient to make a *prima facie* case of employment discrimination or to satisfy the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See* 534 U.S. at 510, 122 S.Ct. 992; *see also Patane v. Clark*, 508 F.3d 106, 113 (2d Cir.2007). Rather, "a complaint must include ... a plain statement of the claim ... [that] give[s] the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Swierkiewicz*, 534 U.S. at 512, 122 S.Ct. 992 (internal quotation marks omitted). Accordingly, to overcome a Rule 12(b)(6) motion to dismiss in an employment discrimination case, a complaint must give fair notice of the basis of plaintiff's claims and the claims must be facially plausible.

■■ In analyzing a motion to dismiss pursuant to Rule 12(b)(6), consideration is generally limited to the factual allegations in the complaint. Rule 12(d), Fed.R.Civ.P. A court, however, may also consider certain documents such as those incorporated by reference or attached to the complaint as exhibits and items of which judicial notice may be taken. *See Samuels v. Air Transp. Local 504*, 992 F.2d 12, 15 (2d Cir.1993). Additionally, a court may consider a document "where the complaint relies heavily upon its terms and effect, [thus] render[ing] the document integral to the complaint." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir.2002) (internal quotation marks omitted).

I. *Plaintiffs Claims Against the Individual Defendant*

 Neither the ADEA nor Title VII allows for the imposition of personal liability on the part of an individual, employee or supervisor. *See Wrighten v. Glowski*, 232 F.3d 119, 120 (2d Cir.2000) (finding that individual defendants may not be personally liable under Title VII) (citing *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1313 (2d Cir.1995), *abrogated on other grounds*, *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998)); *see also Parker v. Metro. Transp. Auth.*, 97 F.Supp.2d 437, 452 (S.D.N.Y. 2000) (finding that an individual defendant may not be liable under the ADEA). Similarly, the ADA does not provide for personal liability on the part of non-employer individuals, except in the case of claims under Title II of the ADA asserted against individuals in their official capacity for prospective injunctive relief. *See Harris v. Mills*, 572 F.3d 66, 72–73 (2d Cir.2009) (holding that claims for prospective injunctive relief under Title II of the ADA and the Rehabilitation Act against a state official in her official capacity can be asserted). Plaintiff does not assert such a claim here.

Jones, the Executive Director of plaintiffs employer, may not be held personally liable under Title VII, the ADEA and ADA. Thus, all federal claims against defendant Jones are dismissed.

II. *Plaintiff's Claims for Discrimination, Retaliation And Hostile Work Environment under Title VII*

 Title VII of the Civil Rights Act of 1964 prohibits employers from discriminating against an individual on the basis of "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a). Title VII does not encompass claims for employment discrimination on the basis of age. *See e.g., Gen. Dynamics Land Sys., Inc. v.*

*Cline*, 540 U.S. 581, 586–87, 124 S.Ct. 1236, 157 L.Ed.2d 1094 (2004) ("Congress chose not to include age within discrimination forbidden by Title VII of the Civil Rights Act of 1964 …."). As the plaintiff only alleges discrimination and retaliation on the basis of age (*see e.g.,* Compl. ¶¶ 164– 65) and disability (*see e.g.,* Compl. ¶ 162), the Complaint fails to state a claim under Title VII.

Accordingly, plaintiff's claim against NDS under Title VII is dismissed.

III. *Plaintiff's Claims for Discrimination, Retaliation And Hostile Work Environment under the ADEA*

 Unlike Title VII, the ADEA prohibits employment discrimination on the basis of age. *See* 29 U.S.C. § 623(a); *Lorillard v. Pons*, 434 U.S. 575, 577, 98 S.Ct. 866, 55 L.Ed.2d 40 (1978) ("The ADEA broadly prohibits arbitrary discrimination in the workplace based on age."). The substantive antidiscrimination provisions of the ADEA "are modeled upon the prohibitions of Title VII." *McKennon v. Nashville Banner Pub. Co.*, 513 U.S. 352, 357, 115 S.Ct. 879, 130 L.Ed.2d 852 (1995). In fact, "the prohibitions of the ADEA were derived *in haec verba* from Title VII." *Lorillard*, 434 U.S. at 584, 98 S.Ct. 866; *compare* 42 U.S.C. § 2000e–2(a) *with* 29 U.S.C. § 623(a). As such, interpretations of the substantive antidiscrimination provisions of Title VII apply "with equal force" in the context of ADEA age discrimination cases. *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121, 105 S.Ct. 613, 83 L.Ed.2d 523 (1985).

A. *Discrimination Claim Based on Age Under the ADEA*

1. *Disparate–Treatment Based Claim for Discrimination*

Under the ADEA, it is unlawful for an employer "to fail or refuse to hire or to

discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age ...." 29 U.S.C. § 623(a)(1). This clause of the ADEA has been interpreted as prohibiting intentional disparate treatment on the basis of age. *Hazen Paper Co. v. Biggins,* 507 U.S. 604, 609, 113 S.Ct. 1701, 123 L.Ed.2d 338 (1993).

At the pleading stage, a plaintiff is not required to come forth with allegations sufficient to make a prima facie case of employment discrimination or to satisfy the burden-shifting framework of *McDonnell Douglas. See Swierkiewicz,* 534 U.S. at 510, 122 S.Ct. 992 (stating that *McDonnell Douglas* sets forth an evidentiary standard, as opposed to a pleading requirement). A complaint must nevertheless allege the essential elements of an employment discrimination claim—that plaintiff suffered discrimination on the basis of protected status. *Patane,* 508 F.3d at 112. A plaintiff must allege that he suffered an "adverse employment action." *Id.* To qualify as "adverse," an action must "cause a 'materially adverse change in the terms and conditions of employment,' and not just 'mere inconvenience.'" *Id.* (quoting *Fairbrother v. Morrison,* 412 F.3d 39, 56 (2d Cir.2005), *abrogated on other grounds, Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006) ("*White*")). Moreover, a plaintiff is required to set forth factual circumstances from which discriminatory motivation for such action can be inferred. *Id.* Allegations supporting motive may include preferential treatment given to similarly situated individuals or remarks that convey discriminatory animus. *Id.* In the absence of such allegations, dismissal at the pleading stage is warranted. *Id.* at 112–13.

Here, plaintiffs Complaint does not state a claim because no facts alleged, viewed in a light most favorable to plaintiff, amount to adverse employment action by NDS. An adverse employment action is an action that causes a "materially adverse change in the terms and conditions of employment." *Galabya v. N.Y.C. Bd. of Educ.,* 202 F.3d 636, 640 (2d Cir.2000) (internal quotation marks omitted). To qualify as "materially adverse" the change in the terms and conditions of employment must be "more disruptive than a mere inconvenience or an alteration of job responsibilities ... [and] might be indicated by a termination of employment, a demotion evidence by a decrease in pay or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices ... unique to a particular situation." *Id.* (internal quotation marks omitted).

Plaintiff does not allege that he has been terminated; on the contrary, plaintiff alleges that he "is presently still employed with Neighborhood Defender Service." (Compl. ¶ 2.) Moreover, plaintiff does not allege that he has been demoted from his position as Computer Service Director. (*Id.* ¶ 3.) Read generously, plaintiff asserts the following as adverse employment actions: (1) he was subject to supervision from June 5, 2008 to July 17, 2008 by a supervisor other than the Executive Director who was under the age of 40 (*Id.* ¶¶ 3(a), 59); (2) he was "alerted to several performance and conduct issues which he had no prior knowledge of" at a July 17, 2008 meeting with the Executive Director (*Id.* ¶ 3(g)); and (3) his "management responsibilities were reduced" at the July 17, 2008 meeting. (*Id.*) Accepting as true, and viewing in a light most favorable to plaintiff, none of these circumstances individually or taken together amount to adverse employment action.

■ The first allegation—that plaintiff, who was age 45, was subject to a six-week period of supervision by a supervisor under the age of 40—does not rise to the level of an adverse employment action. Excessive scrutiny and close monitoring without more do not constitute adverse employment actions. *See Bennett v. Watson Wyatt & Co.*, 136 F.Supp.2d 236, 248 (S.D.N.Y.2001) ("Courts in this district have found that reprimands, threats of disciplinary action and excessive scrutiny do not constitute adverse employment actions."); *Castro v. N.Y.C. Bd. of Educ. Pers.*, 96 Civ. 6314(MBM), 1998 WL 108004, *7 (S.D.N.Y. Mar. 12, 1998) (finding that while close monitoring of plaintiffs classroom may "cause an employee embarrassment or anxiety, such intangible consequences are not materially adverse alterations of employment conditions"). Accordingly, the isolated supervision of plaintiff over an approximate six-week period related to his work on a single project does not constitute a materially adverse employment action.

■ Similarly, the second allegation—that plaintiff was alerted to several performance and conduct issues—does not rise to the level of adverse employment action. Negative evaluations or reviews, without accompanying tangible harm or consequences, do not constitute materially adverse action altering the conditions of employment. *See Weeks v. N.Y. State Div. of Parole*, 273 F.3d 76, 86 (2d Cir.2001) ("It hardly needs saying that criticism of an employee (which is part of training and necessary to allow employees to develop, improve and avoid discipline) is not an adverse employment action."), *abrogated on other grounds, Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002); *Carmellino v. Dist. 20 of N.Y.C. Dept. of Educ.*, 03 Civ. 5942(PKC), 2006 WL 2583019, *3 (S.D.N.Y. Sept. 6, 2006) ("[A] negative performance evaluation—without more—does not ordinarily constitute an adverse employment action for purposes of a discrimination claim."); *Bennett*, 136 F.Supp.2d at 247 ("Courts have held that negative evaluations, standing alone with any accompanying adverse results, are not cognizable."). Accordingly, the comments made to plaintiff regarding complaints that had been made about him that he is "rude, inconsiderate and shows favoritism," "is also slow to upgrade the companies [sic] computers and that is conservative," "does not 'think out of the box,'" and "is too conservative," without any tangible harm or consequences do not constitute a materially adverse employment action.

Finally, plaintiff alleges that his management responsibilities were reduced at the July 17, 2008 meeting with Jones, the Executive Director of NDS. (Compl. ¶ 3(g).) Plaintiff's Complaint, however, does not state how his management responsibilities were affected. After the July 17, 2008 meeting plaintiff admits that he remained in his position as Computer Services Director (*Id.* ¶ 3) and "was not put on a performance improvement plan." (*Id.* ¶ 77.) Plaintiff alleges that Gutierrez, the COO and plaintiff's new supervisor, began giving the IT department reports at staff meetings rather than plaintiff. This is a minor alteration of plaintiff's job responsibilities and does not rise to the level of a materially adverse change in the terms and conditions of plaintiff's employment. *See Galabya*, 202 F.3d at 640 (finding that to qualify as "materially adverse" the change in the terms and conditions of employment must be "more disruptive than a mere inconvenience or an alteration of job responsibilities ... [and] might be indicated by a termination of employment, a demotion evidence by a decrease in pay or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices ... unique to a particular situation");

*see also Fraser v. Fiduciary Trust Co. Intern.*, 04 Civ. 6958(PAC), 2009 WL 2601389, *6 n. 7 (S.D.N.Y. Aug. 25, 2009) (noting that relieving plaintiff, a Vice President of Fiduciary Trust Company, of his responsibility for a client newsletter did not constitute an adverse employment action as defined by the Second Circuit in *Galabya* because while the action "might constitute an alteration of job responsibilities, ... it certainly does not represent a significant diminution of those responsibilities.")

The only other actions—or inactions—that conceivably relates to plaintiff's management responsibilities are plaintiffs assertions that Jones has not verbally spoken to him in over a year and that plaintiff is not invited to any management meetings. (*Id.* ¶¶ 131–32.) Plaintiff, however, explicitly characterizes these as retaliatory to his filing an EEOC complaint in December 2008 and not based upon discriminatory animus because of age. *See Patane*, 508 F.3d at 112 (affirming the district court's dismissal of plaintiff's gender discrimination claim for failure to plead any specific gender-based adverse employment action where plaintiff's only specific employment actions that might have qualified as materially adverse were characterized in her complaint as retaliatory and not gender-based). But even if this Court were to generously assume that the foregoing was based upon discriminatory animus because of age it would not amount to adverse employment action for reasons that will be explained in the discussion of plaintiff's retaliation claim. Thus, plaintiff's allegation of reduced management responsibility does not constitute an adverse employment action motivated by age. None of the circumstances, individually or collectively, amount to an adverse employment action.

Based upon the foregoing, plaintiff's claim for age discrimination based on dis-parate treatment under the ADEA is dismissed.

### 2. Disparate–Impact Based Claim for Age Discrimination

■■■ Under the ADEA, it is unlawful for an employer "to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's age .... " 29 U.S.C. § 623(a)(2). The Supreme Court, in *Smith v. City of Jackson, Miss.*, has interpreted this clause as authorizing recovery on a disparate-impact theory. 544 U.S. 228, 240, 125 S.Ct. 1536, 161 L.Ed.2d 410 (2005). Under this clause, facially neutral employment practices that have a disparate impact based on age are prohibited, thus, " 'an employer who classifies his employees without respect to age may still be liable under the terms of [section 623(a)(2) of the ADEA] if such classification adversely affects the employee because of that employee's age.' " *Meacham v. Knolls Atomic Power Lab.*, 554 U.S. 84, 95–96, 128 S.Ct. 2395, 171 L.Ed.2d 283 (2008) (quoting *Smith v. City of Jackson, Miss.*, 544 U.S. 228, 236 n. 6, 125 S.Ct. 1536, 161 L.Ed.2d 410 (2005)).

■■■ The scope of disparate-impact liability under the ADEA, unlike under Title VII, is considerably narrower. *City of Jackson*, 544 U.S. at 240, 125 S.Ct. 1536. One reason for the narrower scope is the "reasonable factors other than age" ("RFOA") provision included in the ADEA, but not included in Title VII, which precludes liability "if the adverse impact was attributable to a nonage factor that was 'reasonable.' " *See id.* at 239, 125 S.Ct. 1536; *see also* 29 U.S.C. § 623(f) ("It shall not be unlawful for an employer ... (1) to take action otherwise prohibited under subsection[ ] (a) ... where the differentia-

tion is based on reasonable factors other than age ....”). “Congress’ decision to limit the coverage of the ADEA by including the RFOA provision is consistent with the fact that age, unlike race or other classifications protected by Title VII, not uncommonly has relevance to an individual’s capacity to engage in certain types of employment.” *City of Jackson,* 544 U.S. at 240, 125 S.Ct. 1536. Thus, an employer can justify a policy that has an adverse impact on some employees by showing it is based on reasonable factors other than age. In *City of Jackson,* the Court found that the City’s decision to grant raises based on seniority and position, specifically its decision to grant a larger raise to its lower ranked employees, composed largely of individuals under age 40, to bring salaries in line with that of surrounding police forces, “was a decision based on a reasonable factor other than age that responded to the City’s legitimate goal of retaining police officers.” 544 U.S. at 242, 125 S.Ct. 1536.

▮▮▮▮ The RFOA exemption from liability for disparate-impact claims under the ADEA is an affirmative defense, on which the employer bears both the burden of production and burden of persuasion. *Meacham,* 554 U.S. at 93–94, 128 S.Ct. 2395. An affirmative defense “ ‘may be raised by a pre-answer motion to dismiss under Rule 12(b)(6) ... if the defense appears on the face of the complaint.’ ” *Iowa Pub. Emp. Ret. Sys. v. MF Global Ltd.,* 620 F.3d 137, 145 (2d Cir.2010) (quoting *Pani v. Empire Blue Cross Blue Shield,* 152 F.3d 67, 74 (2d Cir.1998)). A court may-dismiss a claim on the basis of an affirmative defense raised in the motion to dismiss, “only if ‘the facts supporting the defense appear on the face of the complaint,’ and ‘it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief.’ ” *U.S. v. Space Hunters, Inc.,* 429 F.3d 416, 426 (2d Cir.2005) (quot-

ing *McKenna v. Wright,* 386 F.3d 432, 436 (2d Cir.2004) (internal quotation marks omitted)).

▮▮▮ Plaintiff alleges that NDS’s decision in 2008 to give members of its administrative staff, of which plaintiff is one, a 3% salary increase rather than the expected 5% salary increase and to keep attorney salaries the same is a facially-neutral employment practice with a disparate impact based on age because members of the administrative staff are largely over 40 years of age while NDS’s attorneys are largely under 40 years of age. (Compl. ¶¶ 3(i). 88–90.) Plaintiff, however, also alleges in his Complaint that “[i]n 2008, the New York City and New York State agencies which fund NDS instituted significant budget cuts to NDS and other agencies. As a result of these budget cuts, NDS instituted an across the board 3% cap on raises for administrative staff.” (*Id.* ¶ 111.) Moreover, plaintiff acknowledges in his Complaint that NDS attorneys are paid according to a different rate structure than administrative staff; “NDS pays its lawyers based on years out of law school ....” (*Id.* ¶ 26.) By acknowledging that NDS capped raises for administrative staff at 3% beginning in 2008 because of significant budget cuts and that attorneys were not affected by the cap because they are paid according to a lockstep system, plaintiff, on the face of his Complaint, pleads facts showing that NDS’s action is supported by an RFOA. The facts alleged by plaintiff show that the employment action taken by NDS was a reaction to budget cuts imposed by the City and State and the disparate impact is attributable to NDS’s reasonable decision to implement the budget cuts based on position—attorney versus non-attorney—and to implement them so as not to impact the lockstep attorney pay system commonly utilized in the legal profession in order to retain its

attorneys. *See City of Jackson*, 544 U.S. at 242, 125 S.Ct. 1536 (holding that reliance on position in giving larger raises to lower ranks of the City's police department is reasonable in light of the City's "legitimate goal[s]" of "raising employee's salaries to match those in surrounding communities" and "retaining police officers").

Based upon the foregoing, plaintiff's claim for discrimination under the ADEA based on disparate-impact is dismissed.

### B. *Claim for Hostile Work Environment in Violation of the ADEA*

 A plaintiff bringing a hostile work environment claim under the ADEA need not plead a *prima facie* case of discrimination based on hostile work environment, but nonetheless must allege facts from which a Court can infer that "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently pervasive to alter the conditions of the victim's employment ...." *Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 240 (2d Cir.2007) (internal quotation marks omitted). Plaintiff must also demonstrate that he was "subjected to hostility because of [his] membership in a protected class." *Id.* at 241 (internal quotation marks omitted). Whether a workplace is hostile "depends on whether a reasonable person would find the work environment to be hostile and whether plaintiffs subjectively perceived it to be so." *Id.* at 240. The incidents complained of must be "continuous and concerted to be considered pervasive;" "minor incidents do not merit relief." *Id.* at 240–41.

 The factual allegations in the Complaint are insufficient to state a claim for hostile work environment. Plaintiff bases his claim for hostile work environment on the actions and attitude of Thomas Giovanni, an attorney for NDS under the age of 40. The Complaint alleges that

Giovanni supervised plaintiffs work on an isolated project from June 4, 2008 to July 17, 2008 without having the proper authority or expertise to do so. In connection with this brief period of supervision, plaintiff only alleges that Giovanni and the plaintiff exchanged emails regarding the computer workstation problem of another NDS employee. (Compl. ¶¶ 16–18.) There is no allegation that Giovanni's emails contained any age-based intimidation, ridicule or insult. Seemingly, plaintiff alleges that the fact of this brief supervision, itself, created a hostile work environment because of the alleged history of conflict between Giovanni and plaintiff when the two work together. Plaintiff alleges that he "had made several formal complaints about Mr. Giovanni's management style" (*Id.* ¶ 19) and references an email he sent on June 6, 2008 to Jones, among others, detailing his conflict with Giovanni. (*Id.* ¶ 32; June 6, 2008 Email, attached at Gerrald Deck Ex. C.)

None of the foregoing facts can fairly be interpreted as age-based discriminatory intimidation, ridicule or insult sufficient to put an employer on notice of plaintiff's claim for hostile work environment based on age discrimination. Plaintiff's allegations merely evidence a personality conflict between Giovanni and himself. Plaintiff has pled no facts from which to infer that plaintiff's age played any role in the conflict. The facts described by plaintiff—the exchange of emails between Giovanni and plaintiff regarding an employee's workstation and Giovanni's comments about his printer malfunctioning—implicate a conflict over how plaintiff handles his duties and responsibilities as Computer Service Director and not his age. Thus these isolated incidents of workplace conflict unrelated to plaintiff's age are insufficient to state a claim for hostile work environment under the ADEA. *See Kassner*, 496 F.3d at 241 (finding that one plaintiff waitress, age 79, stated a claim for hostile work

environment at the pleading stage where the complaint alleged that plaintiffs supervisor and his subordinates "repeatedly made degrading comments towards [plaintiff] including, but not limited to, 'drop dead,' 'retire early,' take off all of that make-up,' and 'take off you wig,'" but that other waitress plaintiff, age 61, did not state a claim for hostile work environment where the complaint merely alleged that plaintiff "was suspended without pay for an incident without conducting a proper investigation" without any indication that age played a role in the action).

Accordingly, plaintiff's claim for hostile work environment under the ADEA is dismissed.

### C. Claim for Retaliation in Violation of the ADEA

 The ADEA prohibits an employer from discriminating against an individual employee because of the individual's opposition to any practice made unlawful under the statute. 29 U.S.C. § 623(d). To state a claim for retaliation in violation of the ADEA, a plaintiff must plead facts that would tend to show that "(1) [plaintiff] participated in a protected activity known to the defendant; (2) the defendant took an employment action disadvantaging [plaintiff]: and (3) there exists a causal connection between the protected activity and the adverse action." Patane, 508 F.3d at 115 (internal quotation marks omitted); see Gorzynski v. Jetblue Airways Corp., 596 F.3d 93, 110 (2d Cir.2010).

 On or about December 22, 2008, plaintiff filed a "Charge of Discrimination" with the EEOC. (Compl. ¶ 108; Charge of Discrimination, attached to Compl.) In his EEOC complaint, the plaintiff alleged that he was being discrim-

inated against on the basis of age and cited as examples the newly-instituted supervision by Giovanni, an attorney and supervisor under the age of 40, and the comments made by Jones at the June 17, 2008 meeting. (Charge of Discrimination, attached to Compl.) It is well established that the filing of an EEOC complaint is a protected activity. See Clark Cnty. Sch. Dist. v. Breeden, 532 U.S. 268, 273, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001) (filing of the EEOC complaint is a protected action); see also Gutierrez v. City of New York, 756 F.Supp.2d 491, 497–98 (S.D.N.Y.2010). Moreover, "to establish participation in a protected activity, a plaintiff is required to show not an actual violation of the act, but only that he was acting under a good faith, reasonable belief that such a violation existed." Grant v. Hazelett Strip–Casting Corp., 880 F.2d 1564, 1569 (2d Cir.1989) (internal quotation marks omitted). Thus, the merits of plaintiff's underlying discrimination claim are not relevant to whether plaintiff's activity is protected under the ADEA and there is nothing to suggest that plaintiff was acting other than in good faith and held a reasonable belief that a violation existed. Additionally, it is clear that defendants knew that plaintiff filed an EEOC complaint. The EEOC is required by statute to promptly notify all persons named in a charge as prospective defendants upon receiving such charge. See 29 U.S.C. § 626(d)(2). Defendant was notified of the EEOC complaint on February 3, 2009 (Notice of Charge of Discrimination, attached to Compl.) and filed a Position Statement with the EEOC in response and replied to document requests by the EEOC shortly thereafter. (Compl. ¶ 109; NDS's Document Requests Response to EEOC, attached to Compl.) [2]

2. Plaintiff alleges that, prior to filing his complaint with the EEOC, he engaged in protected activity under the ADEA by reporting his concerns regarding Giovanni's interactions with him to the Human Resources Director and the Executive Director of NDS on June 5, 2008 and June 6, 2008, respectively. (Compl. ¶¶ 25, 32.) While the definition of protected

■ While plaintiff engaged in a protected activity, he has not alleged sufficient facts showing that he suffered an adverse employment action. The contours of adverse employment action are defined more broadly under the ADEA's anti-retaliation provision than under its antidiscrimination provision. *See Wanamaker v. Columbian Rope Co.*, 108 F.3d 462, 466 (2d Cir.1997); *see also White*, 548 U.S. at 57, 126 S.Ct. 2405; *Patane*, 508 F.3d at 116. In retaliation cases, the ADEA does not define adverse employment action only in terms of discharge or demotion; rather, as in retaliation cases brought under Title VII, any action that "could well dissuade a reasonable worker from making or supporting a charge of discrimination" could constitute retaliation. *White*, 548 U.S. at 57, 126 S.Ct. 2405. The ADEA, like Title VII, seeks to prevent employer interference with employees' "unfettered access" to the statute's remedial mechanisms by "prohibiting employer actions that are likely to deter victims of discrimination from complaining to the EEOC, the courts and their employers." *Id.* at 68, 126 S.Ct. 2405 (internal quotation marks omitted).

Under this standard, "less flagrant reprisals by employers" may constitute an adverse employment action; however, "not every unpleasant matter short of [discharge or demotion] creates a cause of action for retaliatory discharge." *Wanamaker*, 108 F.3d at 466 (internal quotation marks omitted) (alteration in original).

"[P]etty slights, minor annoyances, and simple lack of good manners" are generally not actionable as they are not likely to deter victims of discrimination from complaining of the discrimination. *White*, 548 U.S. at 68, 126 S.Ct. 2405. The context of any given act matters in determining whether it would deter a reasonable employee from complaining about discrimination. *Id.* at 69, 126 S.Ct. 2405 ("The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectation, and relationship which are not fully captured by a simple recitation of the words used or the physical acts performed." (internal quotation marks omitted)).

■ The plaintiff alleges that Jones, the Executive Director of NDS, has (1) not verbally spoken to plaintiff since the filing of his EEOC complaint (Compl. ¶ 131) and (2) has not invited plaintiff to any management meetings since the filing of his EEOC complaint (*Id.* ¶ 132). As noted, plaintiff has reported to Gutierrez, the COO. and not Jones, since July 2008. Jones' alleged refusal to speak to plaintiff is a non-actionable petty slight and simple lack of good manners that does not amount to adverse employment action because a reasonable employee would not be dissuaded from making or supporting a charge of discrimination as a result. *White*, 548 U.S. at 68, 126 S.Ct. 2405 (quoting legal treatise for the proposition that "personality con-

activity encompasses "informal protests of discriminatory employment practices," such as "making complaints to management," *Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir.1990), plaintiff's emails are too vague to support a claim that he opposed unlawful discrimination on the basis of age and thus do not constitute a protected activity under the ADEA. While it is clear that plaintiff believes he is being treated unfairly by Giovanni, the emails cannot be fairly read to show that age motivated the allegedly unfair treatment. To the contrary, the emails suggest that the is-

sues between plaintiff and Giovanni arise from a personality conflict between the two. *See Barber v. CSX Distrib. Servs.*, 68 F.3d 694, 702 (3d Cir.1995) (finding that plaintiffs letter to the Department of Human Resources was not a complaint opposing a practice made unlawful by the ADEA because while the letter made clear that plaintiff believed he was being treated unfairly in being passed over for the promotion in favor of a "less qualified individual" the letter "does not explicitly or implicitly allege that age was the reason for the alleged unfairness").

flicts at work that generate antipathy and snubbing by supervisors and co-workers are not actionable" as they amount to petty slights and minor annoyances).

Plaintiff's allegation that he was excluded from management meetings, when considered in context, does not constitute an adverse employment action. As plaintiff alleged in his Complaint, he continues to maintain his position as the Computer Services Director of NDS, he has not been put on a performance improvement plan and his role and responsibilities have remained largely the same, with the exception that he is now supervised by the COO, who also supervises the human resources department and facilities, rather than the Executive Director. (Compl. ¶¶ 2–3, 59–60, 77, 107.) While plaintiff may be subjectively unhappy with his exclusion from management meetings, the failure to invite plaintiff to management meetings does not rise to the level of a material adverse action such that a reasonable employee in the plaintiff's position would be dissuaded from making or supporting a charge of discrimination. Moreover, the plaintiff has not alleged any facts to suggest that plaintiff's exclusion from management meetings prohibits plaintiff from receiving critical training in his field necessary for his advancement. *See White,* 548 U.S. at 69, 126 S.Ct. 2405 (exclusion from a "weekly training lunch that contributes significantly to the employee's professional advancement" cited by the Court as an example of an action that, when taken in context, might deter a reasonable employee from complaining about discrimination). The action which plaintiff suffered here is more akin to keeping plaintiff out of the organization's "information loop," which the Second Circuit in *Patane v. Clark* noted was insufficient, by itself, to constitute retaliation. 508 F.3d at 116 n. 8; *see also Hayward v. Thuge,* 07–10622–BC, 2009 WL 1086765, *28–29 (E.D.Mich. Apr. 22, 2009) (finding that plaintiff did not suffer any adverse employment action sufficient to claim retaliation under the ADEA where plaintiff was shunned from management meetings after filing a complaint with the EEOC); *Bozeman v. Per–Se Tech., Inc.,* 456 F.Supp.2d 1282, 1343 (N.D.Ga.2006) (finding that plaintiff's claim that he was excluded from management meetings did not constitute an adverse employment action in the context of a retaliation claim under Title VII because a reasonable person would not be dissuaded from making a charge of discrimination).

Accordingly, plaintiff's retaliation claim under the ADEA is dismissed.

### IV. *Plaintiff's Claim for Discrimination Under the ADA*

The ADA prohibits employment discrimination on the basis of disability. 42 U.S.C. § 12112(a). In order to state a claim for employment discrimination under the ADA, the plaintiff must, among other things, plead facts showing that plaintiff suffers from a disability within the meaning of the ADA. The ADA defines disability as either "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." *Id.* at § 12102(1). The statute specifically provides that the definition of disability is to be construed broadly. *Id.* at § 12102(4)(A). Here, plaintiff fails to allege facts from which to infer that he possesses a physical or mental impairment that substantially limits him in one or more major life activities.

In determining whether plaintiff suffers from a disability as defined by the ADA, courts first consider whether the condition plaintiff alleges constitutes a physical or mental impairment. *See Bragdon v. Abbott,* 524 U.S. 624, 631, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998). Plaintiff alleges that

he suffers from "anxiety, depressed mood, stress, chronic tension headache, [and] insomnia." (FMLA Form at ¶ 4, attached at Gerrald Decl. Ex. F.) [3] Plaintiff's condition commenced in approximately March, 2008 and its duration is "unknown, dependent on work situation and stressors." (*Id.* at ¶ 5(a).) EEOC regulations, to which the Court "accord[s] great deference" because the EEOC "is charged with administering the statute," *Francis v. City of Meriden,* 129 F.3d 281, 283 n. 1 (2d Cir.1997), define a "physical or mental impairment," as follows:

(1) Any physiological disorder, or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genito-urinary, hemic and lymphatic, skin, and endocrine; or

(2) Any mental or psychological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities.

29 CFR § 1630.2(h). "'[S]tress and depression are conditions that may or may not be considered impairments, depending on whether these conditions result from a documented physiological or mental disorder.'" *Santos v. City of New York,* 01 Civ. 0120(SAS), 2001 WL 1568813, *4 (S.D.N.Y. Dec. 7, 2001) (quoting EEOC Technical Assistance Manual on the Employment Provisions (Title I) of the ADA § 2.1(a)(i), at II–3 (1992)); *see Reilly v. Revlon, Inc.,* 620 F.Supp.2d 524, 539 (S.D.N.Y.2009) (finding that depression may qualify as a disability for purposes of the ADA, "provided that the condition is not a 'temporary psychological impairment'" (quoting *Oblas v. Am. Home Assur. Co.,* 199 F.3d 1323, 1999 WL 759026,

---

3. In support of defendants' motion to dismiss plaintiffs claim under the ADA, defendants attach a copy of an FMLA form completed by plaintiff's psychologist that describes plaintiff's medical conditions. (FMLA Form, attached at Gerrald Decl. Ex. F.) Significantly, plaintiff voluntarily provided the FMLA form to defendants on July 7, 2008. (*Id.* ¶ 51.) Plaintiff requested by letter dated September 9, 2010 to remove plaintiff's FMLA form from the Court filings in this action or otherwise redact plaintiff's personal medical information contained on this form. (Docket # 24.) Defendants opposed plaintiff's request by letter dated September 13, 2010. (Docket # 26.) This Court denied plaintiffs request by memo endorsement, also dated September 13, 2010. (Docket # 26.) Plaintiff's Complaint specifically references the FMLA form at issue. (Compl. ¶ 51.) The FMLA form is the only place in which plaintiff's disability is described. Plaintiff's Complaint simply states that he has "medical needs" and references the FMLA form provided to defendants. (*Id.*) Plaintiff thus relies exclusively on the FMLA form to establish the basis of his claim that he is "disabled" within the meaning of the ADA. As such, the FMLA form is properly considered by this Court in deciding defendants' motion to dismiss. *See Holowecki v. Fed. Exp. Corp.,* 440 F.3d 558, 565–66 (2d Cir.2006) (finding that the district court correctly considered documents submitted by defendant in support of its motion to dismiss, none of which were attached to plaintiff's complaint but on which plaintiff relied in stating a claim, because "[w]hen a plaintiff chooses not to attach to the complaint or incorporate by reference a [document] upon which it solely relies and which is integral to the complaint, the court may nevertheless take the document into consideration in deciding the defendant's motion to dismiss" (alteration in original) (internal quotation marks omitted)). Moreover, plaintiff cannot claim privilege over the FMLA form because he affirmatively relies on the psychologist's diagnosis of "anxiety, depressed mood, stress, chronic tension headache [and] insomnia" to form the basis of his disability discrimination claim under the ADA. *See In re Sims,* 534 F.3d 117, 132 (2d Cir.2008) ("'[A] party cannot partially disclose privileged communications or affirmatively rely on privileged communications to *support its claim or defense* and then shield the underlying communications from scrutiny by the opposing party.'" (emphasis in original) (internal quotation marks omitted)).

*2 (2d Cir. Sept. 24, 1999))); *Williams v. N.Y. State Dep't of Labor*, 98 Civ. 3816(RMB), 2000 WL 33175735, *9 (S.D.N.Y. May 25, 2000) (questioning whether plaintiff's anxiety, which included symptoms of depression and insomnia, constituted an impairment under the ADA where plaintiff's condition seemingly arose from personality conflicts with plaintiff's supervisor and co-workers and from a working environment that exposed plaintiff to crude, vulgar language and sexual innuendoes). Plaintiff has not alleged facts which show whether his condition rises to the level of a mental impairment. Nevertheless, for purposes of this motion, this Court will assume that plaintiff has pled facts sufficient to establish that his condition constitutes an impairment within the meaning of the ADA.

Next, courts will consider the life activity upon which the plaintiff relies and whether it constitutes a major life activity. *See Bragdon*, 524 U.S. at 631, 118 S.Ct. 2196. In this case, plaintiff does not specifically identify any major life activities that are substantially limited by his impairment. Although plaintiff does not expressly articulate which major life activities are affected by his impairment, his Complaint alleges that as a result of his stress, depression and anxiety he may need to take sick time in order to attend once weekly psychotherapy sessions. (FMLA Form at ¶ 6(c), attached at Gerrald Decl. Ex. F.) Thus, reading the Complaint generously and drawing all inferences in favor of the plaintiff, it is reasonable to conclude that plaintiff has pled a limitation on his ability to work. Working is a major life activity as defined by EECO regulations. *See* 29 CFR § 1630.2(i).

Finally, in determining whether plaintiff suffers from a disability within the meaning of the ADA, courts will look to whether the plaintiff has pled facts tending to show that the impairment substantially limits the major life activity. *See Bragdon*, 524 U.S. at 631, 118 S.Ct. 2196. The Complaint alleges no facts tending to show that his medical condition limits, let alone substantially limits, his life activity of working in any way. To the contrary, the FMLA form on which the plaintiff relies to establish his disability states that (1) plaintiff is not incapacitated, (2) plaintiff's condition does not require him to take medical leave, (3) plaintiff's condition does not prevent him from performing one or more essential functions of his job, and (4) plaintiff does not need to work intermittently or to work on a less than full schedule as a result of his condition. (FMLA Form at ¶¶ 5(b), 5(c), 7(a), 7(c), attached at Gerrald Decl. Ex. F.) At most, plaintiff may need to take sick time in order to attend therapy sessions once a week. (*Id.* at ¶ 6(a).)[4]

---

**4.** In 2008 Congress amended the ADA to expand its coverage. *See* Pub.L. 110–325, 112 Stat. 3553 (2008). In particular, Congress rejected the narrow construction of the term "substantially limits" as set forth in the EEOC regulations and the Supreme Court's decisions in *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999) (finding that whether an impairment substantially limits a major life activity is to be determined with reference to the ameliorative effects of mitigating measures) and *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 122 S.Ct. 681, 151 L.Ed.2d 615 (2002) (interpreting the terms "substantially" and "major" strictly to create a demanding standard for qualifying as disabled). The amendments became effective January 1, 2009. *Id.* at 3559. Plaintiff's claim arose prior to the effective date of the amendments—plaintiff claims that he was denied reasonable accommodations for his disability at a July 17, 2008 meeting with his supervisors—thus, this Court will apply the statute in effect prior to the amendment. *See Fernandez–Vargas v. Gonzales*, 548 U.S. 30, 37, 126 S.Ct. 2422, 165 L.Ed.2d 323 (2006) ("[I]t has became a rule of general application that a statute shall not be given retroactive effect unless construction is required by explicit language or by necessary implication." (internal quotation marks omitted)); *Ragusa v. Malverne Union Free*

Plaintiff has failed to state a claim of discrimination under the ADA.

## V. *Plaintiff's Pendant State Law Claims*

In addition to his claims asserting violations of the ADEA and ADA, the plaintiff also asserts claims under the NYSHRL and the NYCHRL. This Court declines to exercise supplemental jurisdiction over these state law claims.

Section 1367 of title 28 of the United States Code governs the exercise of supplemental jurisdiction and states in relevant part:

> [I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

28 U.S.C. § 1367(a).

■■■■ Section 1367(c)(3) states that a district court "may decline to exercise supplemental jurisdiction over a claim under subsection (a) if ... the district court has dismissed all claims over which it has original jurisdiction ...." Although section 1367(c)(3) is couched in permissive terms, the Second Circuit has made clear that the Court's discretion "is not boundless." *Valencia ex rel. Franco v. Lee*, 316 F.3d 299, 305 (2d Cir.2003) (finding that the district court abused its discretion by exercising jurisdiction over a state law claim following dismissal of the plaintiffs' federal claims at summary judgment). "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims." *Id.* at 305 (quoting *Carnegie–Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n. 7, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988)). In deciding whether to exercise jurisdiction over supplemental state law claims, district courts should balance the values of judicial economy, convenience, fairness, and comity—the "Cohill factors." *Klein & Co. Futures, Inc. v. Bd. of Trade of City of New York*, 464 F.3d 255, 262 (2d Cir.2006) (citing *Cohill*, 484 U.S. at 350 n. 7, 108 S.Ct. 614). The Second Circuit has deemed it proper to retain supplemental jurisdiction over state law claims in actions that implicate preemption issues, state law claims that remain when federal claims are voluntarily dismissed days before the scheduled start of trial, and state law claims that remain after the district court considered three dispositive motions. *Valencia*, 316 F.3d at 306.

■■■ As all the plaintiff's federal claims have been dismissed, the plaintiff's state law claims are dismissed without prejudice. None of the *Cohill* factors supports the exercise of supplemental jurisdiction over plaintiffs' three remaining claims.

*Sch. Dist.*, 381 Fed.Appx. 85, 87 n. 2 (2d Cir.2010) (summary order) (applying ADA statute in effect during the time period implicated by plaintiff's claims); *Behringer v. Lavelle Sch. for Blind*, 08 Civ. 4899(JGK), 2010 WL 5158644, *7 n. 5 (S.D.N.Y. Dec. 17, 2010); *accord Becerril v. Pima Cnty. Assessor's Office*, 587 F.3d 1162, 1164 (9th Cir. 2009) (finding that the ADA amendments did not operate retroactively). Moreover, even if plaintiff were to assert that defendants allegedly unlawful actions continued beyond the July 17, 2008 meeting until the present, as discussed above, the plaintiff concedes that his medical condition does not impair his ability to work and thus, even under a relaxed definition of "substantially limits," plaintiff has failed to state a claim.

## CONCLUSION

For the reasons set forth above, the defendants' motion to dismiss is GRANTED.

SO ORDERED.